IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| ALONZO SWANSON, JR., | ) | Case No. 1:22-cv-1951 |
| | ) | |
| Plaintiff, | ) | |
| | ) | MAGISTRATE JUDGE |
| v. | ) | THOMAS M. PARKER |
| | ) | |
| COMMISSIONER OF | ) | |
| SOCIAL SECURITY, | ) | **MEMORANDUM OPINION** |
| | ) | **AND ORDER** |
| Defendant. | ) | |

Plaintiff, Alonzo Swanson, Jr., seeks judicial review of the final decision of the Commissioner of Social Security, denying his application for supplemental security income ("SSI") under title XVI of the Social Security Act. Swanson challenges the Administrative Law Judge's negative findings. Swanson argues that the ALJ erred in determining that he did not meet automatic-disability criteria for Listings 12.03, 12.04, and 12.11. Swanson further argues that the ALJ failed to explain the basis for his definition of "superficial interactions" and misevaluated Swanson's subjective symptom complaints.

Because the ALJ applied proper legal standards and reached a decision supported by substantial evidence, the Commissioner's final decision denying Swanson's application for SSI must be affirmed.

## I.    Procedural History

On August 24, 2020, Swanson applied for SSI. (Tr. 133).[1] Swanson alleged that he became disabled on May 21, 2020, due to: (i) schizoaffective disorder; (ii) major depressive

---

[1] The administrative transcript appears in ECF Doc. 6.

disorder; and (iii) attention deficit disorder.  (Tr. 133, 198).  The Social Security Administration

denied Swanson's application initially and upon reconsideration.  (Tr. 48–55, 57–64).  Swanson

requested an administrative hearing.  (Tr. 83).

On November 23, 2021, ALJ George Roscoe heard Swanson's case telephonically and

denied his application in a December 3, 2021 decision.  (Tr. 15–27, 31–46).  In so ruling, the

ALJ determined that Swanson had the residual functional capacity ("RFC") to perform work at

all exertional levels, except:

> [N]o climbing of ladders, ropes, or scaffolds; no exposure to hazards (such as
> heights, machinery, commercial driving); and mental limitation that he perform
> routine tasks in a low stress environment (no fast pace, strict quotas, or frequent
> duty changes) involving superficial interpersonal interactions with coworkers and
> supervisors (no arbitration, negotiation, or confrontation), and no interaction with
> the public as a job requirement[.]

(Tr. 20).

On August 30, 2022, the Appeals Council declined further review, rendering the ALJ's

decision the final decision of the Commissioner.  (Tr. 1–3).  On October 29, 2022, Swanson filed

a complaint to obtain judicial review.  ECF Doc. 1.  On December 28, 2022, the parties

consented to magistrate judge jurisdiction.  ECF Doc. 7.

**II.    Evidence**

**A.    Personal, Educational, and Vocational Evidence**

Swanson was born on July 26, 1982; he was 37 years old on the alleged onset date and 39

years old on the date of the ALJ decision.  (Tr. 133).  Swanson had a high school education but

no specialized or vocational training.  (Tr. 199).  He had past work as: (i) an "Order Filler";

(ii) dishwasher; (iii) general laborer; (iv) assembly line worker; and (v) janitor.  *Id.*  However,

the ALJ found that none qualified as past relevant work.  *See* (Tr. 25).

B.      **Relevant Medical Evidence**

Between 1997 and 2001 Swanson attended Bedford High School, where he received special education as a student with a severe emotional disturbance/severe behavior handicap. (Tr. 166, 243).  Swanson had an existing diagnosis of attention-deficit/hyperactive disorder and a full-scale IQ score in the borderline range.  (Tr. 167, 171–72).  Swanson was noted to have difficulty controlling his temper, moderating his voice, and using appropriate language.  (Tr. 167, 169, 175, 178).  He also exhibited inattentiveness, impulsivity, and a reactive personality which interference with in-classroom achievement; his behavior was noted to be so disruptive that he only went to school part-time.  (Tr. 175, 177–78).  By contrast, Swanson was "very successful in his job."  (Tr. 178).  Swanson graduated with a 1.7 GPA.  (Tr. 243).

On May 21, 2020, Swanson, who resided with his mother, visited Signature Health for a mental health assessment.  (Tr. 295).  Swanson reported that he suffered from: (i) anger outbursts; (ii) depressed mood; (iii) frequent audiovisual hallucinations; (iv) irritability; (v) isolation; (vi) somnambulism; (vii) somniloquy; (viii) trouble sleeping; and (ix) worry.  (Tr. 295–96).  He reported that he was unable to hold a job for more than a few days due to arguments with coworkers and his hallucinations.  (Tr. 296).  The attending counselor found Swanson's symptoms to be consistent with schizoaffective disorder, depressive type, and referred him to counseling services and a psychiatric evaluation.  *Id.*

On May 26, 2020, Swanson visited Frances Austin to initiate counseling services.  (Tr. 262).  Swanson reported problems with agitation, frustration, and occasional racing thoughts.  (Tr. 265–66).  Swanson's mother reported that Swanson "got very upset saying no one likes him and kicked the glass out of her oven door."  (Tr. 266).  During a June 9, 2020 follow-up, Swanson reported that he had "no problems or concerns[.]"  (Tr. 270).  He reported, however, that he felt victimized, and that people weren't nice to him.  *Id.*  His mother added, "[he] says

that about everybody even when it's not true and [he] cannot hold a job because he does not like being told what to do." *Id.*

On June 15, 2020, Swanson attended a telehealth appointment with Kelly Scott, APN, for a psychiatric evaluation. (Tr. 304). Swanson reported symptoms of anxiety, depression, and mania: (i) anhedonia and apathy; (ii) appetite changes; (iii) depressed mood and occasional sadness; (iv) excessive worry; (v) frequent feelings of hopelessness; (vi) lashing out verbally at others; (vii) irritability with task comprehension; (viii) impulsive purchases; (ix) mood changes; (x) poor concentration and short-term memory; (xi) problems with distractibility and sustaining attention and concentration; (xii) racing thoughts; (xiii) restlessness; (xiv) sleep disturbances; and (xv) tearfulness. (Tr. 309). He also reported auditory (voices) and visual (shadows) hallucinations and paranoid thoughts. (Tr. 309–10). Swanson's mental status exam results were remarkable for: (i) depressed mood; (ii) disorganized language; (iii) flat affect; (iv) poor insight and remote memory; and (v) problems staying on topic. (Tr. 306–07). Nurse Practitioner Scott diagnosed Swanson with schizoaffective disorder, major depressive disorder, and attention deficit disorder, prescribing Abilify, Lexapro, and Adderall. (Tr. 307, 310).

On July 7, 2020, Swanson reported to Nurse Practitioner Scott in a telehealth appointment that his symptoms had improved with medication. (Tr. 297, 301). Swanson's mental status exam results were remarkable for: (i) decreased fund of knowledge; (ii) improved attention; (iii) mild paranoid thoughts; (iv) poor insight; and (v) "[s]truggles with recent and remote memory." (Tr. 299–300). Nurse Practitioner Scott continued Swanson's medication treatment. (Tr. 302).

Between June 30 and November 18, 2020, Swanson attended telehealth appointments with Austin, repeatedly disclaiming any issues or concerns. *See* (Tr. 271, 275–76, 279, 281, 284, 286, 289, 291, 294, 313, 317, 318, 322–23, 327). Swanson reported that: (i) he looked forward

4

to fishing with a family friend; (ii) he planned on going to the mall to walk around; (iii) he was going fishing with a neighbor; (iv) he was awaiting a connection with Magnolia House; (v) he was going to the library and watching movies he checked out at home; (vi) he went to the pharmacy to pick up his medication; (vii) he helped his mother around the house; and (viii) he looked forward to an upcoming holiday meal.  (Tr. 275, 279, 284, 294, 322, 327).  With one exception, Swanson's mother echoed Swanson's reporting.  (Tr. 279, 284, 317, 322).  The exception was that Swanson's mother and sister reported that Swanson "posted something on social media where he had on bloody clothes and had on new jewelry which makes them think he has hurt someone, but he told the family someone hurt him."  (Tr. 289).

On November 16, 2020, Swanson attended a telehealth appointment with Jessica McCullough, APN, for a psychiatry follow-up.  (Tr. 328).  Swanson reported that his mood was "ok" but felt aggravated and frustrated at times, stating that he beat on things when he was in "disagreement."  (Tr. 333).  He reported hearing the voice of his deceased father reassure him at night.  *Id.*  And he reported that his daily activities consisted of watching television and talking a walk.  *Id.*  Swanson's mental status exam results were remarkable for: (i) auditory hallucinations; (ii) below average fund of knowledge; (iii) loose associations; (iv) mild distraction; and (v) tangential thought process.  (Tr. 330–31).  Nurse Practitioner McCullough increased Swanson's Abilify dosage.  (Tr. 334).

On December 14, 2020, Swanson attended a second telehealth appointment with Nurse Practitioner McCullough, the treatment notes of which recorded identical subjective reporting and mental status exam results as his first visit.  *See* (Tr. 353–58).  Nurse Practitioner McCullough increased Swanson's Abilify dosage.  (Tr. 359).

On December 17, 2020, Swanson reported to Austin in a telehealth appointment that he had an anger outburst the previous week, though he would not say what happened other than that

"everything is ok now." (Tr. 336, 340). Swanson reported that he was excited getting ready for holiday meals. (Tr. 340). During a January 14, 2021 follow-up, Swanson reported that he had "been managing well with no issues or concerns," helping his mother around the house, and having a lot of "misunderstandings" with his girlfriend. (Tr. 345).

On January 14, 2021, Swanson attended a telehealth appointment with Nurse Practitioner McCullough, with no reported changes from his previous two visits. (Tr. 360, 365). His mental status exam results were the same. (Tr. 362–63). Nurse Practitioner McCullough increased Swanson's Abilify dosage and decreased his Adderall dosage. (Tr. 366).

On February 11, 2021, Swanson reported to Nurse Practitioner McCullough in a telehealth appointment that his mood was "ok" and, although he felt frustrated at times, he was able to manage his feelings without lashing out. (Tr. 367, 372). He reported that he still heard his father's voice at night. (Tr. 372). Swanson's mother reported that his baseline agitation increased "slightly" from his previous visit. *Id.* His mental status exam results were identical to his previous three visits. (Tr. 369–70). Nurse Practitioner McCullough decreased Swanson's dosage of Adderall. (Tr. 373).

On March 11, 2021, Swanson reported to Nurse Practitioner McCullough in a telehealth appointment that he continued to manage his frustration without lashing out and hear his father's voice at night, as well as when it was quiet. (Tr. 374, 379). His mother reported that no outbursts or physical altercations had occurred. (Tr. 379). Both Swanson and his mother were noted to be resistant to further medication changes. (Tr. 380). His mental status exam results were unchanged. (Tr. 376–77). Nurse Practitioner McCullough continued Swanson's medication treatment. (Tr. 380).

On April 19, 2021, Swanson's attended a telehealth appointment with Nurse Practitioner McCullough, the treatment notes of which recorded identical subjective reporting and mental

status exam results as the March visit.  (Tr. 381, 383–84, 386).  Nurse Practitioner McCullough continued Swanson's medication treatment.  (Tr. 387).

On September 22, 2021, Swanson attended a telehealth appointment with Elizabeth Carroll, APN, for a psychiatric follow-up, reporting increased irritability, impulsivity, and restlessness.  (Tr. 391–92).  He reported that he only went out with his mother because of a history of bullying and that he occasionally punched walls or broke things, with little insight into what triggered the outburst.  (Tr. 392).  Swanson's mother reported that he had been more hyperactive.  *Id.*  Swanson's mental status exam results were remarkable for: (i) impaired judgment; (ii) indifferent mood; (iii) limited insight; (iv) perceptual disturbances (noises and shadows); and (v) slowed and monotone speech.  (Tr. 393).  Nurse Practitioner Carroll also noted that there had been lapses in Adderall refills and that Swanson displayed "[a]pparent cognitive limitations."  (Tr. 392–93).  Nurse Practitioner Carroll increased Swanson's Adderall dosage.  (Tr. 393).

On October 6, 2021, Swanson reported to Nurse Practitioner Carroll in a telehealth appointment that his condition was unchanged.  (Tr. 388–89).  His mental status exam results were remarkable for: (i) grossly impaired judgment; (ii) limited insight; (iii) low engagement; (iv) monotone speech; and (v) poverty of thought.  (Tr. 389).  Nurse Practitioner Carroll noted that Swanson never picked up his higher dosage of Adderall and had not taken his medication the day of the appointment.  *Id.*  Nurse Practitioner Carroll continued Swanson's medication treatment.  (Tr. 390).

### C.    Relevant Opinion Evidence

On September 22, 2020, Kristen Haskins, PsyD, evaluated Swanson's mental capacity based on a review of the medical record.  (Tr. 50–51, 54).  Dr. Haskins found that Swanson was moderately limited in each of the paragraph B domains of mental functioning.  (Tr. 51).

Dr. Haskins further opined that Swanson was limited to: (i) one- to three-step tasks which did not require extended periods of close attention to detail or fast pace; (ii) tasks without strict time limitations or production standards; (iii) "occasional, superficial public, supervisory, and coworker contact"; and (iv) routine work, with major changes explained in advanced and implemented gradually.  (Tr. 53–54).  On December 10, 20202, Courtney Zeune, PsyD, concurred with Dr. Haskins's assessment.  (Tr. 59, 61–63).

###    D.    Function Report

On September 9, 2020, Swanson's mother, Johnnie L. Swanson ("Johnnie"), reported on Swanson's functioning.  (Tr. 207–14).  Johnnie reported that Swanson's impairments disabled him from following directions.  (Tr. 207).  She reported difficulties with Swanson's personal care, including: (i) needing to be told to change clothes, bathe, comb his hair, and sit down to eat; (ii) "put[ting] towel on toilet"; and (iii) "catch[hing] him p[ee]ing in my kitchen sink or bathroom sink[.]"  (Tr. 208).  Johnnie reported that he also needed reminders to take his medicine and clean his clothes.  (Tr. 209).

Johnnie reported that Swanson could not cook, preparing instead frozen dinners or sandwiches.  (Tr. 209).  She reported that Swanson could do yardwork but no housework, because it didn't "come out right."  *Id.*  She reported that Swanson could go out alone and grocery shop with her.  (Tr. 210).  She reported that Swanson was able to count change, but she did not trust him to pay bills, handle a savings account, or use a checkbook/money orders.  *Id.*

Johnnie reported Swanson's hobby as watching television, which he did every day.  (Tr. 211).  She reported that Swanson had no friends, with his social activities limited to church and social groups with his mother.  *Id.*  She reported that Swanson was unable to pay attention for any length of time, follow instructions, get along with authority figures, or handle stress.  (Tr.

212-13).  She also reported unusual behaviors, such as knocking on doors, kicking doors down, and busting out walls.  (Tr. 213).

### E.    Relevant Testimonial Evidence

Swanson testified at the administrative hearing that he was unable to work because, according to his past employers, he repeatedly failed to follow directions and was always late. (Tr. 34–35).  He also reported that, according to his mother, he struggled to follow instructions doing housework.  (Tr. 36–37).  He used the sink to urinate because it was there.  (Tr. 37–38).

Swanson testified that he preferred riding a bus over a car because there were certain times a day in which the bus was empty.  (Tr. 38).  He testified that he saw white flashes on the right corner of his eye at random and hearing voices.  (Tr. 39).  He testified that he had no friends, though he sometimes sat down with his cousin to talk and watch television.  (Tr. 39–40). And he testified that, despite taking medication, he felt aggravated and anxious.  (Tr. 36).

Vocational expert ("VE") Gail Klier testified that off-task behavior greater than ten percent would be work preclusive.  (Tr. 43).  The VE testified that limitations consistent with the state agency consultants' opinion (no work involving extended periods of concentration and attention) would preclude all employment.  (Tr. 44–45).

## III.    Law & Analysis

### A.    Standard of Review

The court's review of the Commissioner's final decision denying disability benefits is limited to deciding "whether the ALJ applied the correct legal standards and whether the findings of the ALJ are supported by substantial evidence." *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 405 (6th Cir. 2009).  Substantial evidence exists "if a reasonable mind might accept the relevant evidence as adequate to support a conclusion," *id.* at 406 (internal quotation marks omitted), even if a preponderance of the evidence might support the opposite conclusion,

*O'Brien v. Comm'r of Soc. Sec.*, 819 F. App'x 409, 416 (6th Cir. 2020).  However, the ALJ's decision will not be upheld when the ALJ failed to apply proper legal standards and the legal error prejudiced the claimant.  *Rabbers v. Comm'r SSA*, 582 F.3d 647, 654 (6th Cir. 2009).  Nor will the court uphold a decision when the Commissioner's reasoning does "not build an accurate and logical bridge between the evidence and the result."  *Fleischer v. Astrue*, 774 F. Supp.2d 875, 877 (N.D. Ohio 2011) (internal quotation marks omitted).

### B.    Step Three – Listings 12.03, 12.04, and 12.11

Swanson argues that the ALJ erred when he found that Swanson did not satisfy either the paragraph B or C criteria for Listings 12.03, 12.04, and 12.11.  With respect to paragraph B, Swanson argues that the ALJ erred in finding only "moderate" limitations in his ability to interact with others, concentrate/persist/maintain pace, and adapt/manage himself, because the evidence supported a finding of "marked" limitations.  ECF Doc. 9 at 9–10.  Regarding the paragraph C criteria, Swanson argues that contrary to the ALJ decision, the evidence showed that he relied upon treatment or supports to diminish his symptoms and marginal adjustment.  ECF Doc. 9 at 10.  He further argues that the ALJ failed to articulate the basis for his paragraph C findings.  ECF Doc. 9 at 10–11.  The Commissioner disagrees.  ECF Doc. 12 at 10–16.

At Step Three of the sequential evaluation process, a claimant has the burden to show that he has an impairment or combination of impairments that meets or medically equals the criteria of an impairment listed in 20 C.F.R. § 404, Subpart P, Appendix 1.  *Foster v. Halter*, 279 F.3d 348, 354 (6th Cir. 2001); 20 C.F.R. § 416.920(a)(4)(iii).  If the claimant meets all the criteria of a listed impairment, he is disabled; otherwise, the evaluation proceeds to Step Four.  20 C.F.R. § 416.920(d)-(e); *Bowen v. Yuckert*, 482 U.S. 137, 141 (1987); *see also Rabbers*, 582 F.3d at 653.  In evaluating whether a claimant meets or medically equals a listed impairment, an ALJ must "actually evaluate the evidence, compare it to [the relevant listed impairment], and give an

explained conclusion, in order to facilitate meaningful review." *Reynolds v. Comm'r of Soc. Sec.*, 424 F. App'x 411, 416 (6th Cir. 2011).

Listings 12.03, 12.04, and 12.11 establish the automatic-disability criteria for schizophrenia, depression, and neurodevelopmental disorders. 20 C.F.R. pt. 404, Subpt. P., App. 1 §§ 12.03, 12.04, and 12.11. To meet these Listings, the claimant must show that he meets the functional limitations criteria in paragraph B, which measure the severity of a mental condition in relation to four areas of mental functioning: (i) understand, remember, or apply information; (ii) interact with others; (iii) concentrate, persist, or maintain pace; and (iv) adapt or manage oneself. *Id.* §§ 12.03B, 12.04B, 12.11B. The severity of a limitation is measured on a five-point scale: no limitation; mild limitation (slightly limited functioning); moderate limitation (fair functioning); marked limitation (seriously limited functioning); and extreme limitation (no ability to function). *Id* § 12.00F2. The claimant musts show that a mental health condition resulted in an extreme limitation in one or marked limitations in two of the above areas of mental functioning. *Id.* §§ 12.03B, 12.04B, 12.11B.

A claimant could alternatively meet the severity level for Listings 12.03 and 12.04 by satisfying the criteria in paragraph C. *Id.* §§ 12.03C, 12.04C. To meet the requirements of paragraph C, the existence of the mental disorder must be documented over a two-year period and there must be evidence of:

> 1. Medical treatment, mental health therapy, psychosocial support(s), or a highly structured setting(s) that is ongoing and that diminishes the symptoms and signs of your mental disorder . . . ; and
>
> 2. Marginal adjustment, that is, you have minimal capacity to adapt to changes in your environment or to demands that are not already part of your daily life[.]

*Id.*

1.      **Paragraph B**

I find no basis for remand on Swanson's argument concerning the ALJ's paragraph B

findings.  In analyzing the second, third, and fourth areas of mental functioning, the ALJ

reasoned:

> In interacting with others, [Swanson] has a moderate limitation.  Both [Swanson]
> and his mother have reported difficulty being around others, and examinations
> have been notable for a depressed and/or irritable mood, flat affect, occasional
> low engagement, slow, soft speech, concrete, disorganized language, tangential,
> concrete thought processes, loose associations, occasionally paranoid thought
> content, apparent cognitive limitations, and decreased insight and judgment
> (Exhibit B6E, B2F, B3F, B4F, Hearing Testimony).  However, [Swanson] has
> been conversational and generally engaged on examination, with a
> euthymic/neutral mood at times, otherwise clear speech, and coherent language
> (Exhibit B2F, B3F, B4F).  Notably, [Swanson] is able to shop in stores, go to the
> mall and library, spend time with his girlfriend, use public transportation, get
> along with his mother, with whom he resides, and go to church and social groups
> with his mother (Exhibit B6E, B2F, B3F, Hearing Testimony).  Therefore,
> [Swanson] experiences only moderate difficulty interacting with others.
>
> With regard to concentrating, persisting or maintaining pace, [Swanson] has a
> moderate limitation.  The record contains reports of difficulty maintaining
> attention, following instructions, and completing activities, and to [Swanson]'s
> credit, examinations have revealed slow speech, low engagement, mild
> distraction, impaired attention, concrete thought processes, and apparent cognitive
> limitations (Exhibit B6E, B2F, B3F, B4F).  However, [Swanson] has been
> consistently alert and oriented on examination, with no overt hyperactivity or
> abnormal psychomotor activity noted (Exhibit B1F, B2F, B3F, B4F).  [Swanson]
> does not drive and has difficulty handling money (Exhibit B6E, Hearing
> Testimony).  However, he is able to prepare simple foods, help around the house,
> do yardwork, shop, use a phone, go fishing, check out movies at the library, watch
> television, pick up medications at a grocery store pharmacy, use public
> transportation, and attend church and social groups with his mother, activities that
> would require some level of sustained concentration, persistence, and pace
> (Exhibit B6E, B2F, B3F, Hearing Testimony).  As a result, the undersigned finds
> no more than moderate limitation in this area.
>
> As for adapting or managing oneself, [Swanson] has experienced a moderate
> limitation.  [Swanson] does not live independently and has never had a driver's
> license (Exhibit B6E, Hearing Testimony).  [Swanson] reportedly requires
> reminders to take medications and care for his personal hygiene, and [his] mother
> indicated in written statements completed in September 2020 that she has caught
> [him] urinating in the kitchen or bathroom sinks (Exhibit B6E).  Mental status
> examinations have revealed a depressed, irritable, and/or indifferent mood, a flat
> affect, occasionally low engagement, apparent cognitive limitations, with slow,

monotone speech, concrete language and thought processes, occasionally paranoid thought content, and impaired insight and judgment (Exhibit B2F, B3F, B4F).  However, [Swanson] has been conversant and generally engaged, with clear speech, coherent language, an often euthymic/neutral mood, and otherwise normal thought content, with no suicidal ideation, homicidal ideation, or overt psychosis (*Id.*).  [Swanson] is able to independently care for his personal hygiene, prepare simple foods, use public transportation, spend time with his girlfriend, go out in public alone, and shop in stores, attend church, and attend social groups with his mother (Exhibit B6E, B2F, B3F, Hearing Testimony).  Despite persistent mood symptoms, [Swanson] is able to get along with his mother, with whom he resides, and he is able to attend appointments without any noted difficulty getting along with mental health providers or staff (Exhibit B2F, B3F, B4F, B6E, Hearing Testimony).  Therefore, the [Swanson's] difficulty adapting or managing himself does not exceed the moderate level.

(Tr. 18–19).[2]  The ALJ's analysis of the paragraph B criteria complied with the regulations by actually evaluating the evidence, comparing the limitations demonstrated by that evidence with areas of mental functioning listed in paragraph B, and explaining the basis for his findings. *Reynolds*, 424 F. App'x at 416.

Swanson's challenge to the ALJ's paragraph B analysis is that the evidence supported a finding of "marked" limitations in each of the above three areas of mental functioning.  *See* ECF Doc. 9 at 8–10.  But on judicial review, the court's task isn't to independently determine whether the evidence establishes the severity requirement for paragraph B but to decide whether the ALJ's analysis was consistent with the regulations and whether his reasons for reaching the opposite conclusion were supported by substantial evidence.  *See Blakley*, 581 F.3d at 405. Swanson has not attempted to establish in what way the reasons the reasons the ALJ gave for so concluding were either legally inadequate or unsupported by substantial evidence.  *McPherson v. Kelsey*, 125 F.3d 989, 995–96 (6th Cir. 1997).  So even though Swanson pointed to evidence in his brief he contends would have warranted greater limitations, that is not enough to warrant overturning the ALJ's decision.  *See O'Brien*, 419 F. App'x at 416.

_____

[2] Swanson has not challenged the ALJ's analysis of the first paragraph B functional area.  *McPherson v. Kelsey*, 125 F.3d 989, 995–96 (6th Cir. 1997); *see generally* ECF Doc. 9.

13

2.      **Paragraph C**

The ALJ arguably failed to apply proper legal standards in making his paragraph C

findings.  42 U.S.C. § 1382(c)(3); *Blakley*, 581 F.3d at 405.  The ALJ determined that Swanson

did not meet the paragraph C criteria, because:

> The undersigned has also considered whether the "paragraph C" criteria are
> satisfied. In this case, the evidence fails to establish the presence of the
> "paragraph C" criteria. [Swanson] requires continued case management services
> and increasing psychotropic medication dosages to manage ongoing psychiatric
> symptoms (Exhibit B4F). In addition, the record indicates reliance on family
> members, specifically [Swanson]'s mother, with whom he resides, for assistance
> with activities of daily living (Exhibit B6E, Hearing Testimony). However, the
> record confirms improvement with use of medication, and [Swanson] has not
> required emergency hospitalization or inpatient psychiatric treatment, despite the
> relatively limited, conservative scope of mental health treatment (Exhibit B1F,
> B2F, B3F, B4F). Thus, the record fails to establish a reliance upon medical
> treatment, mental health therapy, psychosocial supports, or a highly structured
> setting to diminish the signs and symptoms of [Swanson]'s mental disorders. In
> addition, the record fails to demonstrate only marginal adjustment, as
> demonstrated by [Swanson]'s intact ability to function outside his home. More
> specifically, [Swanson] is able to go to the mall, go fishing with a friend, shop in
> stores, go to the library, use public transportation, go out alone, and attend church
> and social groups with his mother (Exhibit B6E, B2F, Hearing Testimony). Thus,
> the "C" criteria are not satisfied.

(Tr. 19).

Swanson's primary challenge to the ALJ's paragraph C analysis is that the reasons he

gave did not logically support his conclusion as to either paragraph C criterion.  The argument

has some merit.  Take the ALJ's analysis of paragraph C1.  By the ALJ's own reasoning,

Swanson relied on medical treatment (medication) and psychosocial supports (his mother and

case management services) to manage his symptoms and perform activities of daily living.

However, the ALJ found the criterion not met because of the conservative nature of the treatment

and the lack of either emergent or inpatient care.  The ALJ appears to have conflated the two

paragraph C criteria.  Paragraph C1 requires only evidence that the claimant relies on either

treatment, therapy, psychosocial supports, or a highly structured setting to manage his symptoms,

14

without regard to the kind of treatment received.  20 C.F.R. pt. 404, Subpt. P., App. 1 § 12.00G2b.  The kind of treatment received becomes relevant only to the extent it sheds light on the severity of the claimant's symptoms and his ability to adapt despite them, which is part of the paragraph C2 analysis.  *See id.* §§ 12.00D, 12.00G2c.

Nevertheless, the ALJ's paragraph C1 error was harmless because the ALJ's paragraph C2 finding *was* adequate and would, therefore, independently sustain his finding that Swanson did not meet the paragraph C criteria.  *See Rabbers*, 582 F.3d at 653.  Although brief, the ALJ's reasoning was adequate.  To meet paragraph C2, Swanson had to demonstrate that he had only a "minimal capacity to adapt to changes in [his] environment or to demands that are not already part of [his] daily life."  20 C.F.R. pt. 404, Subpt. P., App. 1 § 12.00G2c.  The ALJ could reasonably conclude that Swanson's ability to engage in a variety of activities of daily living inside and outside the home suggested that he had more than a minimal capacity to adapt to changes in his daily routine.

Swanson argues that the ALJ's paragraph C2 finding failed to account for the fact that Swanson "mostly stays at home with his mother" and treatment notes indicating that his mother accompanied him to appointments.  ECF Doc. 9 at 10–11.  However, the ALJ acknowledged Swanson's mother's deep involvement in his activities of daily living.  (Tr. 19).  He also cited the ways in which Swanson functioned independently.  That the ALJ chose not to conclude that Swanson's reliance on his mother deserved greater weight in light of other evidence is not a basis for remand.  *See O'Brien*, 419 F. App'x at 416.

Thus, the court finds that Swanson's Step Three arguments do not warrant remand.

## C.     Step Four – RFC Definition of "Superficial Interaction"

Swanson argues that the ALJ erred when he expanded upon the state agency consultants' opinion limiting Swanson to superficial interactions, defining the term to mean "no arbitration,

negotiation, or confrontation."  ECF Doc. 9 at 13.  Swanson asserts that the ALJ provided an "unsupported definition/limitation to [his] ability to perform superficial interactions."  *Id.*  The Commissioner disagrees, arguing that Swanson's argument was "waived" by his failure to raise the issue at the ALJ hearing and, alternatively, baseless.  ECF Doc. 12 at 16–17.

At Step Four of the sequential evaluation process, the ALJ must determine a claimant's RFC by considering all relevant and other evidence.  20 C.F.R. § 416.920(e).  This includes medical opinions and prior administrative medical findings, for which the regulations require an explanation of how the ALJ considered their supportability and consistency.  20 C.F.R. § 416.913(a)(2), (5); 20 C.F.R. § 416.920c(b)(2).  And when the ALJ's RFC findings conflict with an opinion, the ALJ must explain why the omitted parts of the opinion were not adopted.  SSR 96-8p, 1996 SSR LEXIS 5, at *7 (July 2, 1996).

Initially, Swanson has not forfeited his argument challenging the ALJ's definition of "superficial interactions."  The Commissioner argues that Swanson "waived" the issue, citing *Luukkonen v. Commissioner of Social Security*, 653 F. App'x 393 (6th Cir. 2016).  ECF Doc. 12 at 17.  That case is inapposite.  In *Luukkonen*, the Sixth Circuit held that the claimant waived her challenge to the ALJ's failure to issue a subpoena by not raising it at the ALJ hearing.  653 F. App'x at 405.  *Luukkonen* did not announce a broad rule that a claimant must anticipate an ALJ's RFC and challenge it on a hypothetical-by-hypothetical basis at the ALJ hearing in order to preserve it for judicial review.  *Cf. Chance v. Comm'r of Soc. Sec.*, No. 3:21-CV-00156, 2022 U.S. Dist. LEXIS 65013, at *13–19 (N.D. Ohio Mar. 17, 2022) (rejecting a similar argument under *Kepke v. Comm'r of Soc. Sec.*, 636 F. App'x 625 (6th Cir. 2012)).  And the Commissioner has not attempted to argue how *Luukkonen* establishes otherwise.

The court finds no merit to Swanson's argument.  Swanson is correct that the ALJ included in his RFC a definition of "superficial interactions" that was not present in the opinion

of the state agency consultants.  However, the state agency consultants did not define the term.  Nor is the term defined in the regulations, the Dictionary of Occupational Titles, or Selected Characteristics of Occupations.  *See Stoodt v. Comm'r of Soc. Sec.*, No. 3:20-cv-02370, 2022 U.S. Dist. LEXIS 43108, at *49 (N.D. Ohio Jan. 13, 2022), *report and recommendation adopted*, 2022 U.S. Dist. LEXIS 43045 (N.D. Ohio Mar. 10, 2022).  Thus, the ALJ was required to convert the undefined term into a vocationally relevant RFC finding and the explain the basis for his definition.  *See Charles N.A. v. Comm'r of Soc. Sec.*, 2:22-cv-3085, 2023 U.S. Dist. LEXIS 9871, at *12 (S.D. Ohio Jan. 19, 2023), *report and recommendation adopted*, 2023 U.S. Dist. LEXIS 19098 (S.D. Ohio Feb. 3, 2023); *Tucker v. Berryhill*, No. 3:16-cv-1337, 2017 U.S. Dist. LEXIS 207473, at *14 (M.D. Tenn. Dec. 18, 2018).

Reading the ALJ decision as a whole and with commonsense, the court finds that the ALJ gave adequately supported reasons for the RFC definition of "superficial interactions."  *See Buckhannon ex rel. J.H. v. Astrue*, 368 F. App'x 674, 678–79 (7th Cir. 2010).  At Step Three, the contrasted Swanson's claimed difficulties with being around others and negative mental status exam findings with positive mental exam findings and activities of daily living from which the ALJ concluded he would have no more than moderate limitations in his ability to interact with others and adapt or management himself.  (Tr. 18–19).  Similarly, at Step Four, the ALJ explained that he assessed no greater limitations in Swanson's ability to interact because of showing that he had been communicate, cooperative, and engaged with treatment providers.  (Tr. 23).  And the ALJ noted Swanson's ability to socialize with others, use public transportation, and attend church and groups.  *Id.*  Altogether, the ALJ built an accurate and logical bridge between the evidence and his definition of "superficial interactions."  *See Fleischer*, 774 F. Supp.2d at 877.

Thus, the court finds that Swanson's argument challenging the ALJ's definition of "superficial interactions" provides no basis for remand.

### D.        Step Four – Subjective Symptom Complaints

Swanson argues that the ALJ erred in evaluating his subjective symptom complaints, because the evidence supported his subjective complaints and the ALJ failed to articulate reasons for reaching the opposite conclusion.  ECF Doc. 9 at 17–18.  The Commissioner disagrees.  ECF Doc. 12 at 18–21.

As stated above, at Step Four of the sequential evaluation process, the ALJ must determine a claimant's RFC by considering all relevant and other evidence.  20 C.F.R. § 404.1520(e).  "In assessing RFC, the [ALJ] must consider limitations and restrictions imposed by all of an individual's impairments, even those that are not 'severe.'"  SSR 96-8p, 1996 SSR LEXIS 5, at *14.  Relevant evidence includes a claimant's medical history, medical signs, laboratory findings, and statements about how the symptoms affect the claimant.  20 C.F.R. § 404.1529(a); *see also* SSR 96-8p, 1996 SSR LEXIS 5, at *13–14.

A claimant's subjective symptom complaints may support a disability finding only when objective medical evidence confirms the alleged severity of the symptoms.  *Blankenship v. Bowen*, 874 F.2d 1116, 1123 (6th Cir. 1989).  Nevertheless, an ALJ is not required to accept a claimant's subjective symptom complaints and may properly discount the claimant's testimony about his symptoms when it is inconsistent with objective medical and other evidence.  *See Jones v. Comm'r of Soc. Sec.*, 336 F.3d 649, 475–76 (6th Cir. 2003); SSR 16-3p, 2016 SSR LEXIS 4, at *15 (Mar. 16, 2016).  If an ALJ discounts or rejects a claimant's subjective complaints, he must clearly state his reasons for doing so.  *See Felisky v. Bowen*, 35 F.3d 1027, 1036 (6th Cir. 1994).

The ALJ applied proper legal standards in his evaluation of Swanson's subjective symptom complaints.  42 U.S.C. § 1383(c)(3); *Blakley*, 581 F.3d at 405.  The ALJ complied with the regulations by: (i) assessing Swanson's RFC in light of the medical evidence, his testimony, and other evidence in the record; and (ii) clearly explaining that he rejected Swanson's subjective symptom complains because his statements regarding the intensity, persistence, and limiting effects of his symptoms were not entirely consistent with the objective evidence.  20 C.F.R. § 416.920(e); SSR 16-3p, 2016 SSR LEXIS 4, at *3–4, 11–12, 15; SSR 96-8p, 1996 SSR LEXIS 5, at *13–15; (Tr. 20–24).  And contrary to Swanson's argument, the ALJ provided sufficiently clear reasons for rejecting his subjective symptom complaint when he stated:

> As shown above, [Swanson] experiences symptoms of schizoaffective disorder, major depressive disorder, and ADD/ADHD that would reasonably interfere with his ability to interact with others, work at a rapid pace, and tolerate a stressful work environment (Exhibit B1F, B2F, B3F, B4F).  Although [Swanson] has been alert, oriented, and able to maintain sufficient concentration to participate in mental status examination, he has presented as a poor historian, with a depressed, irritable, and/or indifferent mood, a flat affect, mild distraction, slow, monotone speech, concrete language, abnormal thoughts, impaired memory, below average fund of knowledge, apparent cognitive limitations, limited insight, and poor judgment (*Id.*).  As a result, the undersigned limits [Swanson] to routine tasks in a low stress environment (no fast pace, strict quotas, or frequent duty changes) involving superficial interpersonal interactions with coworkers and supervisors (no arbitration, negotiation, or confrontation), and no interaction with the public as a job requirement.  In addition, although examinations have not revealed any physical abnormalities, given [Swanson]'s mental impairment diagnoses, reported symptoms, and distraction, cognitive limitations, and impaired insight and judgment on examination, he can never climb ladders, ropes, or scaffolds, and can have no exposure to hazards (such as heights, machinery, commercial driving) (*Id.*).  However, [Swanson] is not precluded from performing unskilled work, or from all interaction with others, as he has been alert, oriented, communicative, and generally cooperative and engaged on examination, with a euthymic/neutral mood and affect at times, clear speech, coherent language, goal-directed thought processes, and generally normal thought content, with no suicidal ideation, homicidal ideation, or overt psychosis (*Id.*).  Thus, additional mental restrictions are not warranted.

\* \* \*

19

[Swanon]'s activities of daily living detract from his allegations of totally debilitating mental impairment and instead support the foregoing residual functional capacity.  The record contains reports of limited activities of daily living, as [Swanson] resides with his mother, who reminds him to take medications and care for his personal hygiene, and [Swanson] does not cook, drive, or engage in social activities, and has difficulty handling money (Exhibit B6E, Hearing Testimony).  In addition, in written statements completed in September 2020, [Swanson]'s mother, Jo[h]nnie Swanson, reported severely impaired personal hygiene, as she has caught the claimant urinating in the kitchen or bathroom sinks (Exhibit B6E).  However, [Swanson] is admittedly able to help his mother around the house, prepare simple foods, like frozen dinners or sandwiches, mow the yard, shop in stores, socialize with others over the phone, count change, use public transportation, and attend church and social groups with his mother (Exhibit B6E, Hearing Testimony).  Mental health treatment notes indicate far less restricted activities, including spending time with a girlfriend, going fishing with a family friend, going to the mall, going to the library, watching movies he checked out at the library, going to Giant Eagle to pick up prescriptions, helping his mother around the house, and doing yardwork and gardening tasks (Exhibit B2F/6, 15, 19, 34; B3F/16, 10).  [Swanson] is able to get along with his mother, with whom he resides, and he has expressed excitement about upcoming holiday meals (Exhibit B3F/16).  In sum, [Swanson]'s activities, while perhaps somewhat restricted, nevertheless confirm he is not as mentally limited as alleged

In assessing [Swanson]'s allegations, the undersigned has considered the scope of treatment.  [Swanson] has undergone formal mental health treatment at Signature Health since May 2020, which has consisted of medication management and some outpatient counseling services (Exhibit B2F, B3F, B4F).  Although case management treatment notes are not included in the record, it appears [Swanson] receives case management services through Signature Health as well (*See Id*.).  Despite medication dosage increases, [Swanson] has remained symptomatic, thereby confirming the need for continued medication and treatment (*Id*.).  However, the record confirms improvement with use of medication, and [Swanson] does not appear to be engaging in current counseling services (*Id*.).  In addition, [Swanson] has not required emergency hospitalization or inpatient psychiatric treatment, even during periods of treatment gaps and/or medication noncompliance (*Id*.).  This suggests [Swanson]'s mental impairments, while severe, are manageable with relatively limited, conservative behavioral health treatment.

(Tr. 22–24).

Against this analysis Swanson lodges three conclusory arguments: (i) the ALJ didn't articulate reasons for rejecting his subjective symptom complaints; (ii) the ALJ failed to support his conclusion with substantial evidence; and (iii) the evidence clearly supported his subjective

symptom complaints.  ECF Doc. 9 at 17–18.  In addition to being underdeveloped, none have merit.  *See McPherson*, 125 F.3d at 995–96.  The first two arguments are belied by the ALJ's analysis, quoted above, with which Swansons has not attempted to engage.  And the third argument merely invites the court to reweigh the evidence, which we cannot do.  *See Jones*, 336 F.3d at 476.

    Thus, Swanson's challenge to the ALJ's analysis of his subjective symptom complaints does not warrant remand.

## IV.    Conclusion

    Because the ALJ applied proper legal standards and reached a decision supported by substantial evidence, the Commissioner's final decision denying Swanson's application for SSI is affirmed.

**IT IS SO ORDERED.**

Dated: July 28, 2023

                                           Thomas M. Parker
                                 United States Magistrate Judge